IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 18, 2020 Session

## KYLE RICHARD FREEMON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**No. 80523        David M. Bragg, Judge**

### No. M2019-02220-CCA-R3-PC

In 2018, the Petitioner, Kyle Richard Freemon, pleaded guilty to sexual battery by an authority figure, a Class C felony, and the trial court sentenced him to six years of incarceration, suspended after the service of six months. The Petitioner filed a petition for post-conviction relief in which he alleged that his guilty plea was not knowingly and voluntarily entered because he had received the ineffective assistance of counsel. The post-conviction court dismissed the petition, and the Petitioner appeals. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, P.J. and ROBERT L. HOLLOWAY, JR. J., joined.

Taylor D. Payne, Murfreesboro, Tennessee, for the appellant, Kyle Richard Freemon.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sharon L. Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Background

This case originates from allegations that the Petitioner had sexual contact with the victim, to whom he was related and over whom he held a position of trust. On March 6, 2018, the Petitioner was indicted for rape, a Class B felony, and statutory rape, a Class E felony. On March 8, 2018, the trial court issued a warrant for his arrest, and officers arrested him the following day. The Petitioner could not post bond, so he remained incarcerated until he was arraigned on April 16, 2018, at which time the trial court

appointed a public defender to represent him.  The Petitioner entered a plea of guilty to the lesser included offense of sexual battery by an authority figure.  At the guilty plea hearing, the State informed the trial court that, had the case gone to trial, it would have proven:

> On January the 1ˢᵗ, 2018, the Department of Children[s'] Services received a referral from a therapist here in town stating that the victim, who is a minor . . ., , date of birth 2-4-2000, had disclosed in therapy that sometime within the last several months th[e] [Petitioner] had engaged in sexual contact with her, . . . [and] they are related.  And at the time, he was in a position of trust over her.

> [The Petitioner] was interviewed by the detective, and initially denied, but eventually did make statements against his own interests.

The State recommended a six-year sentence, all suspended, save six months.  The Petitioner received jail credit for time served.  The State then stated, "the State would add that he is to comply with the Sex Offender Registry requirements and stay away from the victim."  The State requested the dismissal of the other pending charge against the Petitioner.  The trial court reviewed the Petitioner's rights with him and ensured that he understood the rights that he was waiving by entering a plea of guilty.  The trial court ensured that the Petitioner was entering his plea freely and voluntarily, that he did not feel rushed, and that he did not have any questions.  The trial court followed the State's recommendation and sentenced the Petitioner to six years of incarceration, with all but six months of that sentence to be served on probation.

The Petitioner filed a petition for post-conviction relief, later amended by post-conviction counsel.  In it, he alleged that his guilty plea was not knowingly and voluntarily entered because he was not made aware of the consequences of his guilty plea, including the requirements of the sexual offender registry or that he would be on the sexual offender registry for life.  He further asserted that his guilty plea was not knowingly or voluntarily entered because he was on medications at the time that it was entered and because he did not know that he could withdraw his plea within thirty days.  The Petitioner also asserted that his counsel ("Counsel") was ineffective for failing to investigate his mental health conditions, failing to inquire about his mental health medications, and failing to interview relevant witnesses.

At a hearing on the petition, Counsel testified that the trial court appointed her in her capacity as a public defender to represent the Petitioner.  She and the Petitioner first met on May 10, 2018, at which time she provided him with the discovery in the case and explained to him the charges against him and the potential punishment he faced.  Counsel

said that the Petitioner faced charges of rape and statutory rape. The discovery included statements from the victim and some DVDs.

Counsel said that the State initially offered the Petitioner a split confinement plea agreement, which would include that he be sentenced to eight years, suspended to probation after one year. Counsel said that she left the discovery with the Petitioner and the two met again on May 18, 2018. Counsel said that the Petitioner's main goal was to be released from jail, since he could not make bond. Counsel said that she and the Petitioner discussed a plea agreement to rape, and she explained the sex offender registry to him and that he would be required to be under community supervision for life. Counsel said that the Petitioner told her that he wanted to plead to something that was not "contingent" upon the sex offender registry. They countered the State's plea offer with an offer to enter a guilty plea to aggravated assault.

Later, the State countered with a plea offer for sexual battery by an authority figure which would have required the Petitioner to register as a sex offender. The benefit of this offer was that the Petitioner would not have to be subject to community supervision for life. Further, if he violated his probation, he would not be required to serve his sentence day for day.

On June 8, 2018, the Petitioner chose to accept this plea offer. He indicated that he wanted to get out of jail.

About potential witnesses, Counsel said that the Petitioner mentioned some witnesses that were present at the bonfire the night that these events occurred. Counsel and the Petitioner discussed the nature of the State's case against him, including the actual admissions that the Petitioner made during his interview. Counsel reiterated that the Petitioner's main goal was to be released from custody. Counsel said that she did not contact any of those witnesses because of time constraints. She gave the Petitioner his discovery on May 10, and he entered his guilty plea on June 8. He wanted to be released from custody as soon as possible, so he chose to enter his guilty plea before she could interview potential witnesses.

Counsel testified that she did not believe that there was a need to investigate the Petitioner's mental health. She was unsure whether the Petitioner was intoxicated at the time that he made incriminating statements to police. Counsel reiterated that she discussed the sex offender registry requirements with the Petitioner prior to his guilty plea. This was, in fact, the reason that he wanted to counter the State's offer with aggravated assault, which would not have the sex offender registry requirement.

During cross-examination, Counsel testified that the Petitioner had told police that

3

he had smoked marijuana, but she was unsure whether the Petitioner meant at the time of the interview or in the past. She did not believe that the Petitioner said that he was drunk or high at the time of his interview with police. The Petitioner never indicated his desire to go to trial.

Counsel testified that, almost two months after the plea, the Petitioner's father called her. He angrily informed her that he was upset that she had not informed the Petitioner that he could withdraw his guilty plea within thirty days. She told him that she did not typically inform her clients of this because they must also show a manifest injustice. He said that he would have testified for the Petitioner, and, when she informed him that she could not discuss the facts of the Petitioner's case with him, he "hung up on" her. Counsel said that she believed that the Petitioner's guilty plea was knowing and voluntary, and she did not think that there were grounds for him to withdraw that plea.

Counsel said that she represented the Petitioner for his guilty plea and then she also represented him during his first probation violation, which was several months after his guilty plea. Counsel said that the trial court then allowed her to withdraw in September 2018.

Counsel reiterated that she informed the Petitioner of the requirements of the sex offender registry, of probation, and of sex offender probation. Counsel testified that, based on the Petitioner's conviction, he could petition to come off the sex offender's registry, so he was not subject to the sex offender registry for life.

Counsel said that she had no indication that the Petitioner's mental health was not intact. She said that he was "fairly sharp, and he was fairly with it." She said that he was the one directing her in that he wanted to counter offer the State with an offense that did not have the sex offender registry requirement. Counsel said that she felt the Petitioner understood the charges that he faced and the basis of those charges. Counsel recalled that the Petitioner told her that his father was a convicted felon, so she was able to work into the conditions of the plea that the Petitioner would still be able to have contact with his father. The Petitioner also noticed and informed her that the victim's date of birth was incorrectly listed in the indictment. The difference did not impact the validity of the indictment, but it showed that the Petitioner was engaged and noting details during the proceedings.

Counsel maintained that the Petitioner's plea agreement was in his best interest. She said that the Petitioner faced eight to twelve years to be served at 100% if convicted at trial. Pursuant to the plea, the Petitioner had very little time left to serve because of the time that he had served when he could not make bond.

4

Counsel recounted how the Petitioner had made an admission of guilt to police, taken a polygraph test, and then made a second admission to touching the alleged victim.

Counsel testified that she represented the Petitioner when he first violated his probation. She met with him, and he expressed frustration with her that she had not told him that he could withdraw his guilty plea. The Petitioner then advised her that he had some mental health concerns. She described him as "upset to the point where [she] asked one of the deputies to have someone check on him." This was, though, well after the Petitioner had entered his guilty plea.

The Petitioner testified, and he said that he pleaded guilty to sexual battery by an authority figure. He said that he told Counsel that he wanted to take his case to trial and not to enter a plea of guilty. He agreed that she told him that he would be on the sex offender registry as part of his plea agreement.

The Petitioner testified that he did not feel like he had any choice other than to enter a plea of guilty. He said that he felt that Counsel would not fight for him. The Petitioner said that he heard what the trial court said during his guilty plea but that it did not register with him. He said that he had mental health issues for which the detention center medicated him. He was on Zyprexa, Prozac, and Precisa. These medications made him "drowsy" and caused him to lose his train of thought. The Petitioner opined that these medications affected his ability to knowingly enter his guilty plea. He said that he was not coherent during the guilty plea hearing, and he did not remember what occurred. He later said he was hearing voices in his head while he was pleading guilty. The Petitioner recounted how he had been diagnosed with schizophrenia. He said that he heard and saw things that other people did not. The voices sometimes caused him to have homicidal fantasies. The Petitioner said that he self-medicated with marijuana, which he believed helped him more than the medicine given to him by doctors.

The Petitioner testified that he was threatened with violence every day that he was incarcerated before he entered his guilty plea. He said that in the facility where he was incarcerated, protective custody inmates were housed with general population inmates. He said that the general population inmates would knock on the door of his cell and threaten to "beat [his] butt." He found this "scary," as he had never been through something like this before. The Petitioner believed that the threats of violence induced him to enter a plea of guilty.

The Petitioner testified that he intentionally violated his probation because he wanted to get back in front of the judge and see if he could have his verdict overturned.

During cross-examination, the Petitioner testified that the jail staff maintained

5

weekly contact with him regarding his mental health. He agreed that in most instances, he did not complain about visions or voices. He explained that he lied to the nurse practitioner about the voices because he did not want the limitations that would come if he was placed on suicide watch. The Petitioner agreed that he also suffered from depression and anxiety.

The Petitioner said that he "never once" told Counsel that he wanted to get out of jail. He maintained that he always told her that he wanted to take his case to trial. The Petitioner said that the day of his guilty plea, he told Counsel that he wanted to take his case to trial and she shook her head "no" and shrugged her shoulders.

The Petitioner agreed that Counsel discussed discovery with him, and she also discussed the ramifications of his guilty plea. The Petitioner agreed that he had previously been incarcerated for contributing to the delinquency of a minor but said that he had not been incarcerated previously for sexually assaulting a minor.

During redirect examination, the Petitioner agreed that on March 22, 2018, he told jail staff that he was positive for schizophrenia with visual tactile hallucinations. On recross examination he stated that when they followed up with him on March 25, 29, and 30, 2018, he stated that he did not have any complaints. He also had no complaints on April 5, May 3, and June 7, 2018.

The Petitioner's father, Kyle Freemon, Sr., testified that in October 2017 he lived in a two-bedroom apartment with his cousin, her daughter, the Petitioner and his brother. Mr. Freemon said that his cousin, Darlena, occupied one of the bedrooms and her daughter, K.R.,[1] occupied the other bedroom. Mr. Freemon and his sons had two blow-up mattresses and a couch in the living room.

Mr. Freemon said that he was present at the party during which the victim said that this assault took place. He said that the victim was having a "little party" with her friends, so they all decided to have a party. The attendants, including the victim and the Petitioner, were drinking and smoking marijuana and going between their house and a neighbor's house. Mr. Freemon said that, during the party, there was a bonfire and that everyone was having a good time. Mr. Freemon said that he did not see anything inappropriate between the victim and the Petitioner.

Several months later, Mr. Freemon learned that the victim had alleged that this assault occurred at the party. Mr. Freemon explained that the victim was hospitalized for attempting suicide. During a family meeting for her treatment, she became angry with

---

[1] K.R. is the minor victim in this case.

things that the Petitioner said to the psychiatrist.  As soon as she was released from psychiatric custody, she made these allegations.

During cross-examination, Mr. Freemon testified that, because of his own felony record, he was unable to see his son until after his son pleaded guilty.  He said that he had encouraged his son to plead not guilty, saying that the victim was not going to show up in court to testify against him.  Mr. Freemon said that he was upset that his son pleaded guilty because he was not guilty.  He said that he himself had been to prison and "done things to guys that came in [prison]" with convictions similar to the Petitioner's convictions.  He agreed that he sent the victim a text message that stated: "thank you for ruining [the Petitioner's] life when you're the one that came onto him."  He also said: "next time . . . you want to kill yourself, I hope you succeed."

Cory McAmis testified that he was present at the party where the assault allegedly occurred.  He said that he got there around 6:00 p.m., and the Petitioner had just awoken.  The two sat at the kitchen table with Mr. Freemon, and people started arriving at the party at around 7:00.  Mr. McAmis said that he and the victim laid outside on a blanket for approximately four hours and that both of them were consuming alcohol.  Mr. McAmis said that the Petitioner was not outside with him and the victim.

During cross-examination, Mr. McAmis testified that he left the party at around midnight and that the Petitioner and the victim were both still at the party.

The Petitioner's brother, Kevin Freemon, testified that he was present at the party.  He said that he and the Petitioner got into a "brotherly disagreement," and the Petitioner blackened his eye.  He recalled that the Petitioner threw up after their disagreement, at around 10:00 or 10:30 p.m.  Thereafter the Petitioner "passed out."

Joy Reinhard testified that she and her daughter, the victim, lived in an apartment with the Petitioner and his father and brother during the time of these allegations.  She recalled the party in question and said that the apartment across from them had a bonfire out back.  The victim was seventeen at the time and Ms. Reinhard told her that she could go to the party and come right back home.  The victim was taking Effexor for depression at the time.  Ms. Reinhard testified that the victim came home at around midnight and threw up on the bathroom floor, and Ms. Reinhard put her to bed.

Ms. Reinhard testified that the victim attempted suicide and protective services came to her home to speak with the victim.  At that time, the victim told Ms. Reinhard that the Petitioner had laid on a blanket with her and had touched and fondled her.  Ms. Reinhard said that she thanked the victim for telling her and then attempted to confirm the victim's story.  Everyone at the party said that the Petitioner and the victim were

7

never on the blanket together and were never alone. Ms. Reinhard said that the victim, who was in college, had not spoken with her in over a year.

Based upon this evidence, the post-conviction court denied the Petitioner relief. It found that the Petitioner had failed to prove by clear and convincing evidence that his plea was unlawfully induced or involuntarily entered. It further found that the Petitioner had also not proven that he had been denied effective counsel.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because his guilty plea was not knowingly and voluntarily entered because he received incorrect legal advice before entering his guilty plea and because he was suffering from schizophrenia at the time of his plea. He further contends that he received the ineffective assistance of counsel because Counsel failed to interview material witnesses. Finally, he contends that he is entitled to relief based upon the cumulative effect of the errors.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this court, with no presumption of correctness. *Id.* at 457.

## A. Guilty Plea

The validity of a guilty plea is a mixed question of law and fact that is reviewed de novo. *Lane*, 316 S.W at 562. To be valid, a guilty plea must be entered knowingly, voluntarily, and intelligently. *Id.* (citing *State v. Mackey*, 553 S.W.2d 337, 340 (Tenn. 1977) *superseded on other grounds by rules as stated in State v. Wilson*, 31 S.W.3d 189, 193 (Tenn. 2000); *North Carolina v. Alford*, 400 U.S. 25, 31 (1970); *Brady v. United*

*States*, 397 U.S. 742, 747 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242-44 (1969)). "[T]he record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea[.]" *Mackey*, 553 S.W.2d at 340; *See* Tenn. R. Crim. P. 11(b)(1). When determining whether a guilty plea was knowingly, voluntarily, and intelligently entered, the court must consider "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Lane*, 316 S.W.3d at 562 (quoting *Grindstaff*, 297 S.W.3d at 218). If a guilty plea is not knowingly, voluntarily, and intelligently entered, then the defendant has been denied due process, and the guilty plea is void. *Id.* (citations omitted).

A plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43). In determining whether a guilty plea is voluntarily and intelligently entered, a trial court must look at a number of factors, which include the following:

> 1) the defendant's relative intelligence; 2) the defendant's familiarity with criminal proceedings; 3) the competency of counsel and the defendant's opportunity to confer with counsel about alternatives; 4) the advice of counsel and the court about the charges and the penalty to be imposed; and 5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial.

*Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006) (citing *Blankenship*, 858 S.W.2d at 904).

### 1. Sex Offender Registry Requirement

The Petitioner contends that his guilty plea was not knowingly and voluntarily entered because he received incorrect legal advice before he entered his guilty plea. Specifically, he asserts that, while Counsel told him that he would be placed on the Sex Offender Registry, he was not informed that he would be on this registry for life and believed that the terms of the registry would be "just like probation." He notes that during the post-conviction hearing, Counsel testified that she thought the Petitioner's conviction was one where he could come off of the registry. In fact, it is classified as a violent sexual offense, so he cannot petition for removal from the sexual offender registry. The State counters that this is not a colorable post-conviction claim because the sex offender registry is a collateral consequence and the trial court's failure to advise a defendant of those requirements does not render a plea constitutionally invalid.

9

In *Emil John Ford v. State*, this court explained that the "registration requirements imposed by the sex offender registration act are nonpunitive and . . . therefore a collateral consequence of a guilty plea." No. E2018-00702-CCA-R3-PC, 2019 WL 1220790, at *4 (Tenn. Crim. App., at Knoxville, March 14, 2019) (citing *Ward v. State*, 315 S.W.3d 461, 472 (Tenn. 2010)), *no Tenn. R. App. P. 11 application filed*. Therefore, "[a]ny failure by the [trial] court or [trial] counsel to explain fully the sexual offender registry to the [p]etitioner does not render his guilty plea[s] invalid." *Id.*; *see also Martin Lewis Privette v. State*, No. M2011-02640-CCA-R3-PC, 2012 WL 6172037, at *9 (Tenn. Crim. App., at Nashville, Dec. 11, 2012), *Tenn. R. App. P. 11 application denied* (Tenn. Apr. 11, 2013). Moreover, "the trial court does not determine the length of time a defendant must remain on the sex offender registry." *State v. Paul Avery Reno*, No. M2016-01903-CCA-R3-CD, 2017 WL 3037538, at *16 (Tenn. Crim. App., at Nashville, July 18, 2017), *no Tenn. R. App. P. App. filed*.

In *Ford*, this court concluded that the petitioner's trial counsel's failure to inform him that he "would be subject to lifetime registration" did not render his guilty pleas invalid given that trial counsel was not required to "explain fully the sexual offender registry" to the petitioner and that the trial court had no control of the length of time the petitioner was to remain on the registry. In that case, the petitioner's trial counsel had explained to the petitioner that he would be on the sex offender registry and the "ramifications" of what that meant. Additionally, the sex offender registry requirement was listed on the plea agreement form signed by the petitioner.

In the case under submission, as in *Ford*, the Petitioner understood that his guilty plea included that he would be subject to the Sex Offender Registry. Counsel reviewed with him the ramifications of the registry, and the Petitioner even testified that he understood that he would be subject to the registry. The Petitioner contends that Counsel did not explain to him that the supervision would be for life. We conclude, as did this court in *Ford*, that any failure by Counsel to fully explain the sexual offender registry to the Petitioner does not render his guilty plea invalid. Accordingly, we conclude that the post-conviction court did not err in rejecting the Petitioner's claim that his guilty pleas were not knowingly and voluntarily entered because he was unaware of the length of time he would remain on the sex offender registry.

## 2. Mental Health

The Petitioner next contends that his guilty plea was "unlawfully induced" and "involuntarily entered" because he was suffering from schizophrenia at the time of his plea, making his plea a product of ignorance and misunderstanding. The State contends that the evidence does not preponderate against the post-conviction court's finding that

10

the Petitioner comprehended the proceedings against him and that Counsel was not ineffective for failing to seek a mental evaluation of the Petitioner.

Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244. Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Statements made in open court carry a strong presumption of truth. *Id*. at 73-74. To overcome such a presumption, a petitioner must present more than "conclusory allegations unsupported by specifics." *Id*.

Based on the foregoing, we conclude that Petitioner has failed to establish that his guilty plea was not knowingly and voluntarily entered because of his mental health or medications for his mental health. Jail health records indicate that the Petitioner suffered from mental health issues however, in the vast majority of the reported health checks, the Petitioner reported having no further issues. Further, Counsel testified she had no indication that the Petitioner suffered from mental health issues that would affect his understanding of the proceedings. She indicated that he actively participated in the plea negotiations and that he directed her during such negotiations. The Petitioner reviewed discovery and found a mistake in the victim's birthdate, and the Petitioner communicated with Counsel effectively. Also, during the plea hearing, the Petitioner swore that he understood the proceedings, that he was entering his plea freely and voluntarily, that he had not been threatened, and that no one had promised him anything in exchange for his plea. We conclude that the evidence does not preponderate against the trial court's finding that the Petitioner's guilty plea was knowingly and voluntarily entered.

## B. Ineffective Assistance of Counsel

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that

counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at

694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the context of a guilty plea, like the present case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have [pled] guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). However, we note that a petitioner's "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

A petitioner's sworn responses to the litany of questions posed by the trial judge at the plea submission hearing represent more than lip service. Indeed, the petitioner's sworn statements and admission of guilt stand as a witness against the petitioner at the post-conviction hearing when the petitioner disavows those statements.

*Alfonso C. Camacho v. State*, No. M2008-00410-CCA-R3-PC, 2009 WL 2567715, at *7 (Tenn. Crim. App. Aug. 18, 2009), *Tenn. R. App. P. 11 application denied* (Tenn. Feb. 10, 2010).

## 1. Material Witnesses

The Petitioner contends that Counsel was ineffective by not interviewing material witnesses. Counsel credibly testified that the Petitioner, who had admitted to sexually touching the victim two separate times to law enforcement officers, wanted to be released from custody. She said that he wanted to enter a guilty plea that did not involve community supervision for life and that he wanted to be released as soon as possible, since he was unable to make bond. He was incarcerated in March and pleaded guilty and released from custody in June. Counsel said that because of the quick timeline and the Petitioner's goals, she was unable to conduct a normal investigation in this case, which would have included interviewing witnesses. The post-conviction court found that the four witnesses the Petitioner presented at the post-conviction hearing presented contradictory recounts of the events at the party. We conclude that Counsel was not ineffective for pursuing the case in accordance with the Petitioner's wishes. Her client, who had admitted guilt, told her that he wanted to enter a guilty plea and be released from custody. She obtained a plea agreement for him pursuant to which he would be released almost immediately on probation. He entered his plea, and was released, and then violated his probation, which he now says he did intentionally in order to appear before

13

the trial court.  We find, like the post-conviction court, his contentions unpersuasive, and we conclude Counsel was not ineffective.  We further conclude that the Petitioner has not proven prejudice because he has not proven that but for Counsel's failure to interview these witnesses, he would not have entered a plea of guilty.  He is not entitled to relief on this issue.

## 2.  Cumulative Error

The Petitioner also alleges cumulative error.  "Reversals for cumulative error are rare." *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015).  Our supreme court has summarized the doctrine as follows:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010).  In the post-conviction context, "a petitioner cannot successfully claim he was prejudiced by [trial] counsel's cumulative error when the petitioner failed to show [trial] counsel's performance was deficient." *James Allen Gooch v. State*, No. M2014-00454-CCA-R3-PC, 2015 WL 498724, at \*10 (Tenn. Crim. App. Feb. 4, 2015), *no Tenn. R. App. P. 11 application filed*.  The Petitioner has failed to prove that trial counsel was deficient or that he was prejudiced by any of the deficiencies alleged in his brief.  Therefore, the cumulative error doctrine does not apply in this case.

## III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

14